IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger

Civil Action No. 17-cv-00730-MSK

HEATHER J. BOLTON,

    Plaintiff,

v.

COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,

    Defendant.

# OPINION AND ORDER REVERSING AND REMANDING DISABILITY DETERMINATION

**THIS MATTER** comes before the Court as an appeal from the Commissioner's Final Administrative Decision ("Decision") determining that the Plaintiff Heather J. Bolton is not disabled within the meaning of sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act. Having considered all of the documents filed, including the record **(#12)**, the Court now finds and concludes as follows:

## JURISDICTION

The Court has jurisdiction over an appeal from a final decision of the Commissioner under 42 U.S.C. § 405(g). Ms. Bolton sought disability insurance benefits and supplemental security income under the Social Security Act based on mental and physical impairments that rendered her unable to work as of March 12, 2013. The state agency denied her claim. She requested a hearing before an Administrative Law Judge ("ALJ"), who issued an unfavorable decision. Ms. Bolton appealed to the Appeals Council, which denied her request for review, making the ALJ's determination the final decision of the Commissioner. Ms. Bolton timely

1

appealed to this Court.

## STATEMENT OF FACTS

The Court offers a brief summary of the facts here and elaborates as necessary in its analysis.

Ms. Bolton was born on May 20, 1970. She obtained her GED when she was twenty-one years old and has worked as a teacher aide, line cook, and a deli cutter-slicer. She contends that mental and physical impairments prevent her from working.

Ms. Bolton suffers from multiple mental and physical impairments. Her mental health impairments include bipolar disorder and anxiety disorder. Her physical impairments include seizure disorder, headaches or migraines, lumbar spine disorder, and degenerative disc disease.

**Treatment and Opinions by Treating Professionals**

John Martens, M.D. is a psychiatrist who began treating Ms. Bolton on May 15, 2013 for bipolar disorder, panic disorder with agora, opioid dependence (in remission), and bulimia nervosa. On May 13, 2015, he filled out a mental residual functional capacity questionnaire and a mental residual functional capacity statement in support of her disability claim.

In the mental residual functional capacity questionnaire, Dr. Martens stated that Ms. Bolton manifested the following signs and symptoms: appetite disturbance with weight change, decreased energy, suicidal thoughts, feelings of guilt or worthlessness, impaired impulse control, persistent anxiety, mood disturbance, difficulty thinking or concentrating, recurrent recollections of past traumatic experiences, paranoia, recurrent obsessions or compulsions, substance dependence, emotional withdrawal or isolation, intense and unstable interpersonal relationships and impulsive and damaging behavior, hallucinations, emotional lability, flight of ideas, manic syndrome, deeply ingrained maladaptive patterns of behavior, vigilance and scanning, pressures

of speech, easy distractibility, autonomic hyperactivity, memory impairment, sleep disturbance, oddities of though, perception, speech, or behavior, decreased need for sleep, loss of intellectual ability, and recurrent severe panic attacks.

Dr. Martens also opined in the mental residual functional questionnaire that:

- Ms. Bolton's abilities to set realistic goals or make plans independently of others, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness were **unlimited or very good;**
- her abilities to understand, remember, and carry out instructions, whether short and simple or detailed, maintain attention for two hours, maintain regular attendance and be punctual, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being duly distracted, make simple work-related decisions, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, be aware of normal hazards and take appropriate precautions, deal with stress of semiskilled and skilled work, interact appropriately with the general public, travel in unfamiliar places, and use public transportation were **limited but satisfactory**;
- and her abilities to remember work-like procedure, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number of length or rest periods, get along with co-workers or peers without unduly distracting them or exhibiting behavior extremes, respond appropriately to changes in a routine work setting, and deal with normal stress were **severely limited.**

He further opined that she would be absent from work because of her impairments about four

days per month.

In the mental residual functional statement, Dr. Martens opined that:

- Ms. Bolton's abilities to interact appropriately with the general public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness **did not preclude her performance of any aspect of a job;**
- her abilities to carry out very short and simple instructions, work in coordination with or in proximity to others without being distracted, and make simple work-related decisions **precluded her performance of a job for 5% of an eight-hour workday**;
- her abilities to understand and remember very short and simple instructions, maintain attention and concentration for extended periods of time, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, complete a normal workday and workweek without interruptions from symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, be aware of normal hazards and take appropriate precautions, and set realistic goals or make plans independently of others decisions **precluded her performance of a job for 10% of an eight-hour workday**;
- and her abilities to remember locations and work-like procedures, understand, remember, and carry out detailed instructions, respond appropriately to changes in the work setting, and travel in unfamiliar places or use public transportation **precluded her performance of a job for 15% of an eight-hour workday.**

Dr. Martens further opined in the mental residual functional statement that Ms. Bolton would be off task for 20% of an eight-hour work day, five days per week, she would be absent from work for three days each month, she would be unable to complete an eight-hour workday three days per month, and could only perform a job eight hours per day, five days per week, on a sustained basis for 50% of the time.

Kirsten Nielsen, M.D. and Melissa Butler, P.A.C., both at Lutheran Neurology, began treating Ms. Bolton on June 30, 2014 for her seizure disorder and migraine headaches. On February 10, 2015, Ms. Butler completed a headaches residual functional capacity questionnaire and a seizures medical source statement. On June 10, 2015, Dr. Nielsen completed a medical source statement.

In the headaches residual functional capacity questionnaire, Ms. Butler opined that Ms. Bolton likely would have one migraine headache per month that would last for one to two days and would require her to rest for twenty-four to forty-eight hours before returning to work. She would likely need to take one unscheduled work break per month, and would be absent from work about two days each month. Symptoms associated with her migraines included nausea, vomiting, malaise, photosensitivity, visual disturbances, mood changes, mental confusion, and the inability to concentrate. Ms. Butler also identified tenderness as an objective sign of the migraine headaches. Ms. Butler opined that Ms. Bolton was incapable of performing even "low stress" jobs because stress triggered her migraines. Ms. Butler further opined that Ms. Bolton would likely suffer one migraine headache per month.

In her seizures medical source statement, Ms. Butler noted that Ms. Bolton likely would have two to three, non-convulsive seizures per month that would cause Ms. Bolton to be confused for several hours after they ended. Ms. Butler also noted that Ms. Bolton had

5

undergone an EEG test that was "positive … with a right temporal focus". Ms. Butler stated that stress and exertion could precipitate Ms. Bolton's seizures. Ms. Butler opined that Ms. Bolton was incapable of even "low stress" work, that Ms. Bolton could sit for about four hours and stand and/or walk for less than two hours in an eight-hour workday; she could lift ten pounds frequently, lift ten pounds occasionally, lift twenty pounds rarely, but could not lift fifty pounds, and that Ms. Bolton would need to take unscheduled breaks multiple times per hour because of confusion or stress that would last for thirty minutes. Ms. Butler further opined that Ms. Bolton would likely be absent from work about two days each month.

In her medical source statement, Dr. Nielsen was more conservative in her assessment of Ms. Bolton's seizures. She did not conclude that Ms. Bolton suffered from seizures; rather, she stated that Ms. Bolton suffered from seizure-like spells. Where Ms. Butler interpreted Ms. Bolton's EEG to be positive, Dr. Nielsen stated that the EEG was negative but did not rule out epileptic seizures. She noted that Ms. Bolton had not had a seizure-like spell since February 6, 2015 but, prior to that had been having one to four spells per month. She stated that it was unknown whether stress or exertion could precipitate Ms. Bolton's spells but that the spells could cause confusion and severe headaches. She opined that Ms. Bolton could for about four hours in an eight-hour workday, could stand and/or walk for about two hours in an eight-hour workday, could lift ten pounds or less occasionally, but could not lift twenty or more pounds. Although her assessment of Ms. Bolton's seizure-like spells was more conservative, she did opine that Ms. Bolton's migraine headaches would require her to take one to two unscheduled breaks per week and would cause her to be absent from work for about four or more days each month.

**Opinions by Non-treating Professionals**

Bruce Chessen, Ph.D., a psychologist, performed a psychological evaluation of Ms.

Bolton on April 19, 2012 in conjunction with a criminal case pending against her. He reviewed her medical records, interviewed her, and administered the following tests during the evaluation: Beck Depression Inventory II, Personality Assessment Inventory, Millon Clinical Multiaxial Inventory III, and Rorschach Ink Blot Test. He diagnosed her with bipolar I disorder, with opioid dependence, and of being a victim of abuse. He also noted that she had traits of mixed personality disorder including schizotypal, schizoid, avoidant and dependent. He did not provide any opinions relevant to her opinion to work.

Donald Degroot, Ph.D., a psychologist, performed a psychiatric consultative examination for Ms. Bolton on December 10, 2013. His diagnostic impression of Ms. Bolton was that she suffers from bipolar type 1 disorder, anxiety disorder with panic attacks and agoraphobic features, dyslexia by self report, and migraines. He opined that;

- her abilities to understand, remember, and carry out simple instructions, and to make judgments on simple, work-related decisions were mildly impaired; her abilities to understand, remember, and carry out complex instructions and to interact appropriately with supervision, co-workers, and the public were moderately to **markedly impaired**;
- and her abilities to make judgments on complex, work-related decisions, to respond appropriately to usual work situations, and to respond appropriately to changes in a routine work setting were **markedly impaired**.

Claudia Elsner, M.D., performed a consultative medical examination for Ms. Bolton on November 19, 2013. She found that Ms. Bolton suffered from seizure disorder with chronic recurrent headaches, suffered from chronic lower-back pains without signs of radiculopathy, and had an unremarkable musculoskeletal examination, which did not, however, exclude occasional sciatic irritation. She opined that Ms. Bolton should not stand for more than twenty to thirty

7

minutes at a time and could sit for an hour at a time. She further opined, "Any normal daily function including gainful employment is dependent on stable mental health and absence of chronic recurrent headaches."

David H. Bristow, a state-agency physician, reviewed Ms. Bolton's file but did not examine her. He found that Ms. Bolton had the following severe impairments: DDD (disorders of back-discogenic and degenerative), affective disorders, and anxiety disorders. He opined that Ms. Bolton could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for about six hours in an eight-hour workday, could push and/or pull without limitation, could frequently climb ramps and stairs, should never climb ladders, ropes, or scaffolds, could balance without limitation, and could frequently stoop, kneel, crouch, and crawl. He further opined that she should avoid concentrated exposures to hazards such as machinery and heights.

MaryAnn Wharry, Psy.D., a state-agency psychologist, reviewed Ms. Bolton's file on December 29, 2013 but did not examine her. Dr. Wharry opined that:

- Ms. Bolton's abilities to remember locations and work-like procedures, to understand, remember, and carry out short and simple instructions, to perform activities within a schedule, to maintain regular attendance, to be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination with or in proximity to others without being distracted by them, to make simple work-related decisions, to ask simple questions or request assistance, to be aware of normal hazards and take appropriate precautions, to travel in unfamiliar places or use public transportation, and to set realistic goals or make plans independently others were **not significantly limited;**

- and her abilities to understand, remember, and carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior, to adhere to basis standards of neatness and cleanliness, and to respond appropriately to changes in the work setting were **moderately limited**.

## THE ALJ'S DECISION

The ALJ analyzed his case pursuant to the sequential five-step inquiry. At step one, the ALJ found that Ms. Bolton had not worked or engaged in substantial gainful activity from the alleged onset date of March 12, 2013. At step two, the ALJ found Ms. Bolton had the following severe impairments: seizure disorder, lumbar spine disorder, headaches or migraines, bipolar disorder, anxiety disorder, and degenerative disc disease. At step three, the ALJ found that Bolton's impairments did not equal the severity of the listed impairment in the appendix of the regulations. At step four, the ALJ first assessed Ms. Bolton's Residual Functional Capacity ("RFC") and determined that:

> [Ms. Bolton] has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c)--except as otherwise stated as follows. Physically, the claimant is able to lift 50 pounds occasionally and 25 pounds frequently. During an 8-hour workday, the claimant is able to stand and/or walk 6 hours and sit 6 hours. The claimant is able to climb ramps and stairs frequently. The claimant is unable to climb ladders, scaffolds, and ropes. The claimant should avoid all exposure to unprotected heights, pools of water, and motorized vehicles. The claimant is able to frequently stoop, crouch, kneel, and crawl. Mentally, the claimant is able to use judgment in making work decisions; respond appropriately to supervisors, coworkers, and work situations; and deal

9

> with changes in a routine work setting. The claimant is able to understand, remember, and carry out simple instructions. This ability is equivalent to being able to perform unskilled work. The claimant should not perform any assembly-line work. The claimant should not engage in work requiring intense, sustained concentration. The claimant should not interact with the public. The claimant is able to interact with coworkers occasionally.

The ALJ then found that Ms. Bolton could not perform past relevant work as a teacher aide, line cook, or deli cutter-slicer. However, at step five, the ALJ found that Ms. Bolton could perform jobs that exist in significant numbers in the national economy, and thus, she was not disabled.

## ISSUES PRESENTED

Ms. Bolton raises six objections to the Decision: (1) the ALJ erred by failing to find that Ms. Bolton's mental impairments equaled the severity of the listed impairment in the appendix of the regulations; (2) the ALJ erred by failed to have a medical expert testify; (3) the ALJ erred by failing to give Ms. Bolton's treating physician's opinions controlling weight; (4) the ALJ erred when assigning relative weight to the medical opinions in the record; (5) the ALJ improperly determined that Ms. Bolton is not credible; and (6) the ALJ failed to follow governing law when analyzing the statements of lay witnesses. The Court will only address whether the ALJ erred by failing to assign Ms. Bolton's treating physicians' opinions controlling weight because the issue is dispositive.

## STANDARD OF REVIEW

On appeal, a reviewing court's judicial review of the Commissioner of Social Security's determination that claimant is not disabled within the meaning of the Social Security Act is limited to determining whether the Commissioner applied the correct legal standard and whether the Commissioner's decision is supported by substantial evidence. *Hamilton v. Sec'y of Health &Human Servs.*, 961 F.2d 1495, 1497-98 (10th Cir. 1992); *Brown v. Sullivan*, 912 F.2d 1194, 1196 (10th Cir. 1990); *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003). If the ALJ

failed to apply the correct legal standard, the decision must be reversed, regardless of whether there was substantial evidence to support factual findings. *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993). In determining whether substantial evidence supports factual findings, substantial evidence is evidence a reasonable mind would accept as adequate to support a conclusion. *Brown*, 912 F.2d at 1196; *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). It requires more than a scintilla but less than a preponderance of the evidence. *Lax*, 489 F.3d at 1084; *Hedstrom v. Sullivan*, 783 F. Supp. 553, 556 (D. Colo. 1992). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Although a reviewing court must meticulously examine the record, it may not weigh the evidence or substitute its discretion for that of the Commissioner. *Id.*

## ANALYSIS

Ms. Bolton argues that the ALJ erred by failing to give her treating physicians' opinions controlling weight. The Commissioner argues that the ALJ gave legitimate reasons for not doing so.

A medical opinion provided by a treating physician must be given controlling weight if (1) the treating physician is an acceptable medical source, (2) the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques, and (3) the opinion is consistent with the other substantial evidence in the record. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 6, 2006); *Pisciotta v. Astrue*, 500 F.3d 1074, 1077 (10th Cir. 2007). If any of these requirements is not satisfied, then the opinion is not accorded controlling weight. *Drapeau v. Massanri*, 255 F.3d 1211, 1213 (10th Cir 2001). Further, the ALJ must articulate sufficiently specific reasons for not according the opinion controlling weight to enable a court to

11

meaningfully review the ALJ's findings on appeal. *Langley v. Barnhart*, 373 F.3d 1116, 1122 (10th Cir. 2004). The failure to articulate such reasons requires reversal and remand. *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003).

When a treating physician's opinion is not given controlling weight, its relative weight must be assessed in comparison to other medical opinions in the record. The factors considered for assessing the weight of all medical opinions other than those entitled to controlling weight are as follow:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Allman v. Colvin*, 813 F.3d 1326, 1331–32 (10th Cir. 2016). None of these factors are controlling; not all of them apply to every case, and an ALJ need not expressly discuss each factor in his or her decision. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). However, "the record must reflect that the ALJ *considered* every factor in the weight calculation." *Andersen v. Astrue*, 319 Fed. App'x 712, 718-19 (10th Cir. 2009)(*emphasis* in original). Finally, the ALJ must provide legitimate, specific reasons for the relative weight assigned. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004).

The ALJ specifically found that Dr. Martens', Ms. Butler's, and Dr. Nielsen's opinions were not entitled to controlling weight. Although the ALJ cited to the correct legal standard governing whether to give a treating physician's opinion controlling weight, he only expressly addressed the third requirement - whether the opinions are consistent with the other substantial evidence in the record. In so doing, the ALJ did not address the opinions of each medical provider, individually. Instead, he considered them collectively and compared them only to a

conclusion that the ALJ drew from the state agency physician and consulting examiners opinions that "[Ms. Bolton's] limitations would not preclude the performance of substantial gainful activity."

The ALJ fails to identify how the opinions of the state agency physician and consultative examiners specifically conflict with Dr. Martens', Ms. Butler's, and Dr. Nielsen's opinions. None of the state agency physicians' and consultative examiners' reports contain a conclusion that Ms. Bolton's limitations would not preclude the performance of substantial gainful activity. Indeed, the Court would be surprised to find such an opinion in any of their reports. Whether a person is capable is performing substantial gainful activity is an issue reserved to the Commissioner, and it is not appropriate for medical providers or examiners to express an opinion as to this issue. *See* 20 C.F.R. § 404.1527(d); *Cowan v. Astrue*, 552 F.3d 1182, 1189 (10th Cir. 2008). Without specific reference to inconsistencies between the opinions of the state agency physician or consulting examiners and those of Ms. Bolton's treating physicians', the Court cannot meaningfully review the ALJ's finding that Ms. Bolton's physicians' opinions are inconsistent with other evidence in the record.

However, the ALJ's reasons as to the relative weight he assigned to Dr. Martens', Ms. Butler's, and Dr. Nielsen's opinions can also be pertinent to whether such opinions should be entitled to controlling weight. As to Dr. Martens' opinions, among other reasons, the ALJ found that they were entitled to less weight because they are internally inconsistent. An ALJ may legitimately discount medical evidence if the evidence contains internal inconsistencies or is inconsistent with other medical evidence. *See Pisciotta v. Astrue*, 500 F.3d 1074, 1078 (10th Cir. 2007). The ALJ cited to multiple examples in which he found Dr. Martens' opinions to be inconsistent information in Ms. Bolton's treatment records. For example, Dr. Martens

incorrectly stated that Ms. Bolton's highest GAF score for the previous year was 52 when his medical records showed GAF scores of 55 and 58, and in the mental residual functional capacity questionnaire and mental residual functional statement, which were completed on the same day, he expressed differing opinions as to Ms. Bolton's abilities to get along with co-workers, to interact appropriately with the general public, to ask or respond to simple questions, accept instructions and respond appropriately to criticism. These inconsistencies certainly call into question the reliability of Dr. Marten's opinions, especially because he rendered conflicting opinions on the same day. Although, not offered as a reason by the ALJ, this would have been sufficient for the ALJ to find that Dr. Martens' opinions are inconsistent with other substantial evidence in the record and, thus, not entitled to controlling weight.

As to Ms. Bulter's opinions, the ALJ found that they were entitled to less weight because, among other things, Ms. Butler is not an acceptable medical source. Acceptable medical sources include licensed medical or osteopathic doctors, psychologists, optometrists, podiatrists, and qualified speech-language pathologists, but they do not include physician's assistants. *See* SSR 06-03p, 2006 WL 2329939, at *1 (Aug. 6, 2006); *Gonzales v. Colvin*, 69 F. Supp. 3d 1163, 1169 (D. Colo. 2014). Ms. Butler is a physician's assistant. Thus, her opinions are not entitled to controlling weight.

As to Dr. Nielsen's opinions, the ALJ found that they are entitled to less weight because her medical source statement is internally inconsistent and her opinions are inconsistent with treatment records. Specifically, in the medical source statement, Dr. Neilson opined that Ms. Bolton would need to take one to two breaks for two to six hours from work each week because of migraines. The ALJ reasoned that "Dr. Nielsen's opinion is based on a migraine frequency of 1-2 times a week, …", then found that this was inconsistent with the medical source statement

14

because Dr. Nielsen did not mention migraine frequency in it. This reasoning is circular and unsupported. It was not necessary for Dr. Nielsen to expressly address migraine frequency when her opinion as to it could easily be inferred, which the ALJ was clearly able to do. Thus, Dr. Nielsen's technical failure to expressly mention migraine frequency does not support a finding that her medical source statement is internally inconsistent.

The ALJ's second reason for assigning Dr. Nielsen's opinion less weight is that her medical records for Ms. Bolton show that she had migraines only once per month, not once or twice a week. In so finding, the ALJ failed to address contrary evidence that supports Dr. Nielsen's opinion. An ALJ cannot cherry-pick evidence in support of his decision to deny benefits while failing to discuss contrary evidence, especially when the contrary evidence is contained in the same documentation as the supporting evidence. *See Frantz v. Astrue*, 509 F.3d 1299, 1302 (10th Cir. 2007) (quoting *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996)). Indeed, although an ALJ is not required to discuss every item of evidence before him, he is required to "discuss the uncontroverted evidence he [chose] not to rely upon, as well as significantly probative evidence he reject[ed]." *Frantz v. Astrue*, 509 F.3d 1299, 1302 (10th Cir. 2007) (quoting *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996)). The failure to do so makes it impossible for an appellate court to assess whether an ALJ's decision is supported by substantial evidence and requires reversal and remand for the ALJ to set out specific findings and reasons for accepting or rejecting the uncontroverted or substantially probative evidence the ALJ did not rely on or rejected. *Clifton*, 79 F.3d at 1009-10.

Ms. Bolton began receiving treatment from Dr. Nielsen and Ms. Butler on June 30, 2014 and reported that she had been having three to four migraines per week, which each could last for one to three days. R. 1014. On July 28, 2014, Ms. Bolton told Ms. Butler that her treatment was

15

having a positive effect to the degree that she was "no longer having daily headaches." R. 1316. The ALJ failed to address this evidence in the Decision. Instead, he focused exclusively on the treatment record from December 12, 2014, which states that Ms. Bolton's migraine frequency had lessened to once a month. R. 1661.

Notably, Ms. Bolton continued to receive treatment after her December 12, 2014 appointment. She had two more appointments on February 6, 2015 and May 29, 2015 before Dr. Nielsen filled out her medical source statement on June 10, 2015. R. 1633, 1637. After a thorough review of the record, the Court has been unable to locate the notes from Ms. Bolton's treatment with Ms. Butler or Dr. Nielsen on these occasions. The Court will not speculate as to what those notes would contain.

However, other records show that on May 29, 2015, Dr. Nielsen increased Ms. Bolton's Topamax prescription to 100mg a day to treat Ms. Bolton's migraine headaches. R. 2063. On July 20, 2015, Ms. Bolton was admitted in the Lutheran Medical Center for suicidal ideation, and the attending physician stated, "Her seizures are in remission, but her migraines have not improved …" R. 2062. On October 14, 2015, Ms. Bolton's primary care physician also noted that her chronic headaches had not improved. R. 2098, 2101. These records indicate that the severity and frequency of Ms. Bolton's migraine headaches had increased since her December 12, 2014 appointment, which would support Dr. Nielsen's statement that Ms. Bolton was suffering from migraines once or twice a week.

Although the aforementioned evidence would support Dr. Nielsen's opinion, the ALJ failed to address it. Instead, the ALJ cherry-picked a statement from Dr. Nielsen's records to reject her opinion and deny Ms. Bolton's claim. Thus, the Court cannot meaningfully review whether the ALJ's decision not to assign Dr. Nielsen's opinion controlling weight is supported

16

by substantial evidence.

In summary, ALJ's reason for not giving Dr. Nielsen's opinion controlling weight are not sufficiently specific to permit meaningful review. Further, the ALJ's reasons for assigning her opinion little relative weight do not otherwise justify failing to give it controlling weight. Thus, this matter must be reversed and remanded to determine whether Dr. Nielsen's opinion is entitled to controlling weight. Inasmuch as it has determined that this matter must be reversed and remanded, the Court need not address Ms. Bolton's remaining arguments. *See Madrid v. Barnhart*, 447 F.3d 788, 792 (10th Cir. 2006).

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **REVERSED** and this matter is **REMANDED** to the ALJ for further proceedings. The Clerk shall enter a judgment in this matter.

Dated this 11th day of April, 2018.

BY THE COURT:

_____
Marcia S. Krieger
United States District Court